LINDA CARL AND CHARLES R. EILBER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS v. THE STATE OF NORTH CAROLINA, THE N.C. TEACHERS' AND STATE EMPLOYEES' COMPREHENSIVE MAJOR MEDICAL PLAN, A/K/A THE STATE HEALTH PLAN, AND MEDAMERICA INSURANCE CO., DEFENDANTS

No. COA07-1288

(Filed 2 September 2008)

**1. Appeal and Error— appealability—sovereign immunity— *Corum* claim intertwined**

The denial of the State's motion to dismiss causes of action was interlocutory, but immediately appealable, where the motion was based on sovereign immunity. Certiorari was granted to consider the denial of a Rule 12(b)(6) motion to dismiss a *Corum* claim that was inextricably intertwined with the issue before the court as of right.

**2. Immunity— sovereign—third-party beneficiary claims**

Sovereign immunity did not bar state employees' third-party beneficiary claims against the State arising from changes to their long term care plan. The plan conferred long term benefits directly on state employees as consideration for employment.

**3. Immunity— sovereign—ultra vires contract**

Sovereign immunity did not bar breach of contract claims against the State arising from changes to the long term care plan offered to state employees on the theory that the contractual terms were beyond the scope of the State Health Plan's legislatively conferred powers. An ultra vires contract is not enforceable and sovereign immunity is not applicable.

**4. Constitutional Law— takings claim—sovereign immunity**

Sovereign immunity did not bar plaintiffs' takings claim under the North Carolina Constitution, Article I, Section 19, arising from changes in the long term care plan offered to state employees. It was concluded elsewhere in the opinion that sovereign immunity did not bar plaintiffs' breach of contract claim, and the State is not entitled to the defense of sovereign immunity against the takings claim.

**5. Constitutional Law— takings claim—adequate state remedy**

The trial court erred by denying the State's Rule 12(b)(6) motion to dismiss state constitutional takings claims arising

from changes in the long term care plan offered to state employees. There were adequate state remedies through breach of contract claims.

**6. Immunity— sovereign—ultra vires contract**

A crossclaim arising from changes in the long term care plan offered to state employees was not barred by sovereign immunity on an allegation that it was ultra vires. An ultra vires contract is itself void and unenforceable.

**7. Immunity— sovereign—implied indemnity claim**

The trial court erred by denying the State's motion to dismiss an insurance provider's implied-in-law indemnity crossclaim based on sovereign immunity in an action arising from changes in the long term care plan offered to state employees. The insurer's claim was based only on indemnity implied-in-law, but the State waives sovereign immunity only when it expressly enters into a valid contract.

Appeal by Defendants the State of North Carolina and the North Carolina Teachers' and State Employees' Comprehensive Major Medical Plan, a/k/a The State Health Plan, from order entered 5 September 2007 by Judge Catherine C. Eagles in Wake County Superior Court. Heard in the Court of Appeals 19 March 2008.

*Attorney General Roy Cooper, by Special Deputy Attorney General Buren R. Shields, III and Assistant Attorney General Thomas M. Woodward, for the State-Defendants-Appellants.*

*Billet and Connor, P.C., by J. Martin Futrell; Twiggs, Beskind, Strickland & Rabenau, P.A., by Donald H. Beskind; and Marcus Auerback & Zylstra, L.L.C., by Jerome M. Marcus and Jonathan Auerbach, for Plaintiffs-Appellees.*

*Poyner & Spruill, LLP, by Edwin M. Speas, Jr., David Dreifus, and Thomas K. Lindgren, for Defendant/Crossclaim-Plaintiff-Appellee.*

STEPHENS, Judge.

I. Procedure

The State of North Carolina, through the North Carolina Teachers' and State Employees' Comprehensive Major Medical Plan, a/k/a The State Health Plan ("SHP") (collectively the "State"), offered

certain current and retired North Carolina employees Long Term Care ("LTC") Benefits under a contract of insurance with MedAmerica Insurance Company ("MedAmerica"). Plaintiffs are two North Carolina State employees who seek to represent a class of state employees, retired state employees, and retired local government employees who contend that certain representations by SHP and MedAmerica constituted contractual obligations that Plaintiffs' insurance premiums would remain "level," *i.e.*, that there would be no increases unless justified by the claims experience for the group, approved by the Department of Insurance, and applied to the entire group as opposed to any one individual. Plaintiffs brought claims against the State and MedAmerica because Plaintiffs' premiums for LTC Benefits increased beyond that which was level when SHP selected Prudential Insurance Company ("Prudential") to replace MedAmerica at the termination of MedAmerica's contract with SHP.

Plaintiffs filed a Complaint on 14 September 2006, and a Corrected Third Amended Complaint on 18 May 2007, in Wake County Superior Court setting forth the following four claims: (1) SHP breached its contract with MedAmerica, made for Plaintiffs' intended benefit, that SHP would maintain Plaintiffs and other class members as a group and move them into any new group for LTC Benefits following the termination of the MedAmerica contract; (2) SHP breached its contract with Plaintiffs by and through the increase in Plaintiffs' premiums for their LTC Benefits beyond that which was "level;" (3) Plaintiffs had a contractual right to "level" premiums for LTC Benefits, and this contractual right was a property right that was taken without just compensation, in violation of N.C. Constitution Article I, Section 19; and (4) MedAmerica breached its contract with Plaintiffs to maintain a "level" premium for LTC Benefits. On 18 June 2007, the State moved to dismiss Plaintiffs' Complaint.

On 18 June 2007, MedAmerica filed amended crossclaims against the State seeking indemnity for any liability MedAmerica may have to Plaintiffs or the class. On 9 July 2007, the State moved to dismiss MedAmerica's crossclaims.

The State raised a sovereign immunity defense to each claim and crossclaim, pursuant to North Carolina Rules of Civil Procedure 12(b)(1) and (b)(2). The State also moved to dismiss Plaintiffs' constitutional claim ("*Corum* claim"), pursuant to Rule 12(b)(6), arguing that alternative adequate remedies existed. By order entered 5 September 2007, the trial court denied the State's motions.

CARL v. STATE

[192 N.C. App. 544 (2008)]

On 6 September 2007, the State filed timely Notice of Appeal from the trial court's order denying their claims of sovereign immunity. By order entered 28 September 2007, the trial court denied the State's Motion for Stay pending appeal. On 19 October 2007, this Court granted the State's Petition for Supersedeas, staying all proceedings pending appeal. On 21 November 2007, MedAmerica filed a Motion to Dissolve Writ of Supersedeas and Dismiss the State's Interlocutory Appeal. On 30 November 2007, the State filed a Petition for Writ of Certiorari with this Court, seeking review of the trial court's denial of their Rule 12(b)(6) defense to Plaintiffs' *Corum* claim. On 17 December 2007, Plaintiffs filed a Motion to Dismiss the State's Interlocutory Appeal.

## II. Facts

In 1997, the General Assembly authorized SHP to offer LTC Benefits to State employees, retirees, and retired local government workers, and their qualified dependents, on a voluntary, self-pay basis. 1997 N.C. Sess. Laws 468 (codified as amended N.C. Gen. Stat. § 135-41). SHP's Executive Administrator and Board of Trustees were given the sole authority to implement and administer LTC Benefits as fiduciaries of SHP. N.C. Gen. Stat. §§ 135-39.5(22), 135-40(a), and 135-41 (2005). The enabling legislation gave SHP discretion to make such benefits available through a contract of insurance with an insurance carrier selected on a competitive bid basis or by the establishment of a self-insured program administered by SHP. N.C. Gen. Stat. § 135-41. SHP chose to make benefits available through a contract of insurance.

SHP issued a request for proposal ("RFP") from insurance carriers to which MedAmerica responded and was the successful bidder. Upon acceptance, MedAmerica's response to the RFP became part of MedAmerica's LTC Contract with SHP. Under that contract, MedAmerica was to provide LTC Benefits coverage from 1 March 1998 through 31 December 2003, with two options for one-year extensions. One provision of the MedAmerica policy gave enrollees the option of paying their lifetime premium in the first ten years, resulting in a paid-in-full policy at the end of ten years. The contract also contained the following language: "At the termination of this Contract, all enrollees will remain members of the group and move with the group to new group coverage unless group coverage is no longer offered by the Plan." North Carolina Department of Insurance regulations required that upon moving the group from one group coverage to another, SHP's replacement coverage must offer substan-

tially similar benefits with a premium calculated on the age of enrollment in the group being replaced. 11 N.C.A.C. 12.1005 (2005).[1]

Long-term care insurance policies with a level premium are required to maintain, and by necessity create, contract reserves from the excess of premiums over claims in the early years of the policy, when claims are lower, so as to offset excess claims over premiums in the later years when claims are higher. 11 N.C.A.C. 11F.0201(10) and 11F.0205(a)(1)(A) (2005). Accordingly, SHP's contract with MedAmerica created such reserves. MedAmerica agreed to transfer these reserves to the next carrier at the end of its contract.

SHP gave information packets on the LTC Benefits to potential enrollees. The cover letter contained in the packets stated that the premium rates "are offered to you at group rates which are substantially less than comparable individual plans." Information in the packets stated that the "[p]remiums are based upon age at the time coverage is purchased, so the younger you are, the less expensive your premiums will be" and "when you enroll, you lock in your lower premium." Information in the packet also stated the following:

> Your premiums are designed to remain level over your lifetime. They will only be changed if a change is justified based on the claims experience and if approval is obtained from the North Carolina Department of Insurance. Any change of premiums must be made for everyone with similar coverage so you will never be singled out for a rate increase.

With the MedAmerica contract scheduled to expire on 31 December 2003, SHP issued an RFP on 14 August 2003 for another contract to continue LTC Benefits starting 1 January 2004. While SHP received several responses to this 2003 RFP, none provided coverage for enrollees who had elected the ten-year, paid-in-full option. SHP withdrew its 2003 RFP and exercised one of its one-year renewal options with MedAmerica, extending coverage through 31 December 2004.

On 9 March 2004, SHP issued another RFP. The 2004 RFP required the replacement carrier to accept transfer of the existing group, including those who had purchased the ten-year, paid-in-full option. The 2004 RFP also provided for a transfer of reserves "as part of [the] carrier's acceptance of the risk associated with the group." The 2004 RFP required that bidders offer coverage consistent with 11 N.C.A.C.

---

1. Plaintiffs' incorrectly cite 11 N.C.A.C. 12.1015 throughout their brief when discussing this rule.

12.1005,[2] which required that the premium be based upon the age of enrollment in the MedAmerica group and that the coverage offer substantially similar benefits. An addendum to the 2004 RFP stated that it was SHP's "preference that all current insureds transfer to the new carrier with no change in rates of [sic] benefits."

SHP subsequently contracted with Prudential to continue LTC Benefits beginning 1 January 2005. However, after the termination of the MedAmerica contract, SHP did not transfer the group in its entirety to Prudential as existing enrollees who wanted to maintain their LTC Benefits had to enroll in the new Prudential policy at rates based on their age in 2005, rather than when they were first enrolled in LTC Benefits with MedAmerica. According to Plaintiffs, more than 70% of MedAmerica policyholders were 60 or older when they first enrolled in LTC Benefits with MedAmerica and the resulting loss of credit for the years of enrollment caused substantial premium increases.

Because SHP did not transfer the group in its entirety to Prudential, MedAmerica offered an individual conversion policy to existing enrollees. The MedAmerica conversion policy offered similar benefits and calculated premiums using the age of enrollment in the MedAmerica group policy, but based the premiums on an individual rather than a group rate. The resulting MedAmerica individual conversion policy premium was typically lower than that offered by the Prudential group policy, but higher than the former MedAmerica group policy. Plaintiffs contend that approximately 80% of the enrollees in LTC Benefits through the MedAmerica group policy chose the MedAmerica individual conversion policy.

MedAmerica did not transfer the $13,542,304 it held in reserves to Prudential, contending it was not required to do so because SHP did not transfer the group from MedAmerica to Prudential.

### III. Discussion

On appeal, the State contends the trial court erred in denying its motion to dismiss Plaintiffs' three asserted causes of action and MedAmerica's two crossclaims, pursuant to North Carolina Rules of Civil Procedure 12(b)(1) and (b)(2), as enforcement of each claim is barred by sovereign immunity. The State also argues that the trial court erred in denying its motion to dismiss Plaintiffs' *Corum* claim pursuant to North Carolina Rule of Civil Procedure 12(b)(6) because adequate alternative remedies existed.

2. The RFP incorrectly refers to 11 N.C.A.C. 12.1015.

**[1]** The denial of a motion to dismiss is an interlocutory order which is not immediately appealable unless that denial affects a substantial right of the appellant. *RPR & Assocs. v. State*, 139 N.C. App. 525, 534 S.E.2d 247 (2000), *aff'd per curiam*, 353 N.C. 362, 543 S.E.2d 480 (2001); N.C. Gen. Stat. § 7A-27(d) (2005). "[T]he denial of a motion to dismiss based upon the defense of sovereign immunity affects a substantial right and is thus immediately appealable." *RPR & Assocs.*, 139 N.C. App. at 527, 534 S.E.2d at 250. Accordingly, we deny Plaintiffs' and MedAmerica's Motions to Dismiss the State's Interlocutory Appeal and address the State's sovereign immunity arguments on appeal.

A trial court's denial of a Rule 12(b)(6) motion to dismiss generally does not affect a substantial right. *Bolton Corp. v. T. A. Loving Co.*, 317 N.C. 623, 347 S.E.2d 369 (1986). However, the State has moved this Court to grant its "Petition for Writ of Certiorari" to review the trial court's denial of their Rule 12(b)(6) defense to Plaintiffs' *Corum* claim. Although the denial of their Rule 12(b)(6) defense is interlocutory, we agree with the State that the issue is inextricably intertwined with the issues before this Court as of right. Accordingly, we grant the Writ of Certiorari and address the State's argument in this appeal.

"Sovereign immunity protects the State and its agencies from suit absent waiver or consent." *Wood v. N.C. State Univ.*, 147 N.C. App. 336, 338, 556 S.E.2d 38, 40 (2001), *appeal dismissed and disc. review denied*, 355 N.C. 292, 561 S.E.2d 887 (2002). Sovereign immunity can be waived when the State, through its authorized officers and agencies, enters into a valid contract. *Smith v. State*, 289 N.C. 303, 222 S.E.2d 412 (1976). The State "implicitly consents to be sued for damages on [a] contract in the event it breaches the contract." *Id.* at 320, 222 S.E.2d at 424. "When a State . . . waives its governmental immunity, it occupies the same position as any other litigant, and a plaintiff has the same right that he would have to sue an ordinary person. The State in such circumstances is not entitled to special privileges." *Lyon & Sons, Inc. v. N.C. State Bd. of Educ.*, 238 N.C. 24, 27-28, 76 S.E.2d 553, 556 (1953) (citations omitted).

### A. Plaintiffs' Claims

### 1. Third-Party Beneficiaries

**[2]** The State first argues that sovereign immunity bars Plaintiffs' third-party beneficiary claim as "[s]overeign immunity bars enforce-

ment of a contract against the State by any person other than a signatory and actual party to the contract." Plaintiffs contend that, as intended third-party beneficiaries of the contract between SHP and MedAmerica, they were entitled to sue the State for breach of that contract as "no North Carolina decision has held that sovereign immunity bars third-party beneficiary contract claims against the State." Thus, in what appears to be a case of first impression, we must determine whether sovereign immunity bars third-party beneficiary contract claims against the State. We hold that it does not.

"The practice of allowing third-party beneficiaries not in privity of contract to bring an action in their own name to enforce the contract made for their benefit was recognized in North Carolina as early as 1842." *Vogel v. Reed Supply Co.*, 277 N.C. 119, 126, 177 S.E.2d 273, 278 (1970) (citation omitted). "The rule is well established in this jurisdiction that a third person may sue to enforce a binding contract or promise made for his benefit even though he is a stranger both to the contract and to the consideration." *Am. Trust Co. v. Catawba Sales & Processing Co.*, 242 N.C. 370, 379, 88 S.E.2d 233, 239 (1955) (quotation marks and citation omitted). However, "[n]ot every such contract made by one with another, the performance of which would be of benefit to a third person, gives a right of action to such third person." *Id.* "Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must at least show that it was intended for his direct benefit." *Id.* at 379, 88 S.E.2d at 239-40. (quotation marks and citations omitted).

While the State may be correct that "[t]his Court has consistently enforced the bar of sovereign immunity against any theory used by third-parties attempting to enforce others' contracts with the State[,]" this Court has not been faced with the "theory" that sovereign immunity bars third-party beneficiary claims. In the cases cited by the State to support its argument that sovereign immunity bars third-party beneficiary claims, none of the plaintiffs were intended third-party beneficiaries of a contract with the State or attempted to assert third-party beneficiary contract claims. For example, in *Rifenburg Constr., Inc. v. Brier Creek Assocs.*, 160 N.C. App. 626, 586 S.E.2d 812 (2003), *aff'd per curiam*, 358 N.C. 218, 593 S.E.2d 585 (2004), the North Carolina Department of Transportation ("DOT") and a developer entered into a construction contract. The developer then entered into a separate contract with a subcontractor. The subcontractor later filed suit against DOT, alleging DOT breached its contract with the developer.

The subcontractor alleged that the contract between DOT and the contractor formed a joint venture or partnership between DOT and the developer, whereby DOT became liable to the subcontractor for the wrongful acts of the contractor. The subcontractor did not claim that the contract between DOT and the developer was made for its intended benefit, nor did it attempt to assert a third-party beneficiary claim against the State. The State contended that sovereign immunity barred the subcontractor's claim. Upon review, this Court held that DOT was neither a joint venturer nor a partner with the developer and, thus, had not waived its sovereign immunity as to the subcontractor. This Court explained that "[w]hen a state agency . . . enters into an agreement with a developer, who then alone enters into a contract with a contractor, the state agency waives its sovereign immunity only to the original party to their agreement not to others." *Id.* at 631, 586 S.E.2d at 816.

Following *Rifenburg*, this Court in *Welch Constr., Inc. v. N.C. DOT*, 175 N.C. App. 45, 622 S.E.2d 691 (2005), held that the State did not waive sovereign immunity as to the subcontractor of a developer who had entered into a construction contract with DOT. Likewise, in *Bolton Corp. v. State*, 95 N.C. App. 596, 383 S.E.2d 671 (1989), *disc. review denied*, 326 N.C. 47, 389 S.E.2d 85 (1990), this Court held that sovereign immunity barred the plaintiff, who had entered into a construction contract with the State, from bringing a breach of contract action against the State on behalf of the plaintiff's subcontractor, since no contractual relationship existed between the State and the subcontractor.

As none of the plaintiffs in the above cases were intended third-party beneficiaries of contracts with the State and none attempted to assert third-party beneficiary contract claims, this Court did not address the issue of whether sovereign immunity bars third-party beneficiary claims. Accordingly, the cases are factually distinguishable and the holdings in those cases are inapplicable to the case at bar.

Unlike the construction contracts in the above-cited cases which were entered into to satisfy needs of the State, the contract between SHP and MedAmerica in this case was made to confer LTC Benefits directly upon state employees as consideration for their employment. Although the question of whether Plaintiffs were, in fact, intended third-party beneficiaries of the contract between SHP and MedAmerica is not properly before us, reading the above-stated laws of sovereign immunity and contracts together, we conclude: (1) sov-

ereign immunity may be waived when the State enters into a valid contract; (2) when the State waives sovereign immunity, it occupies the same position as any other litigant; (3) when the State occupies the same position as any other litigant, it may be sued by a third party to enforce a contract made for the direct benefit of that third party; and (4) sovereign immunity does not bar third-party beneficiary contract claims against the State.

### 2. *Ultra Vires* Contract

[3] The State next argues that sovereign immunity bars Plaintiffs' claims because SHP had no express authority to set the terms of the 2005 State contract in a commitment to Plaintiffs or MedAmerica and, thus, the alleged contractual promises are *ultra vires* to SHP. SHP is an agency of the State created by N.C. Gen. Stat. §§ 135.40-135.40.14. As a creature of the Legislature, an agency of the State

> can only exercise (1) the powers granted in express terms; (2) those necessarily or fairly implied in or incident to the powers expressly granted; and (3) those essential to the accomplishment of the declared objects of the [agency].

*Madry v. Scotland Neck*, 214 N.C. 461, 462, 199 S.E. 618, 619 (1938) (citations omitted). Thus, SHP "may exercise only such authority as is vested in it by statute[,]" *State ex rel. Utilities Comm'n. v. Thurston Motor Lines, Inc.*, 240 N.C. 166, 168, 81 S.E.2d 404, 406 (1954), and its agents or officers may not bind it by any contract which is beyond the scope of its powers. *Madry*, 214 N.C. 461, 199 S.E. 618. When a State agency attempts to enter into a contract which does not come within the scope of its powers, the contract thereby formed is *ultra vires*. *Id.* "If a contract is *ultra vires*[,] it is wholly void and (1) no recovery can be had against the [State]; (2) there can be no ratification except by the Legislature; (3) the [State] cannot be estopped to deny the validity of the contract." *Id.* at 463, 199 S.E. at 619 (quotation marks and citations omitted).

The State argues here that sovereign immunity bars Plaintiffs' breach of contract claim because the contractual terms at issue are beyond the scope of its legislatively conferred powers, and, thus, are *ultra vires*. In support of this argument, the State asserts that the Court in *Whitfield v. Gilchrest*, 348 N.C. 39, 497 S.E.2d 412 (1998), confirmed the "long-standing law that *ultra vires* contracts against the State remain barred by sovereign immunity." However, the Court in *Whitfield* determined only that sovereign immunity bars an action seeking recovery in *quantum meruit* based on an implied-in-law con-

tract theory. The Court did not address the issue of whether sovereign immunity bars an action seeking to recover for the breach of an express contract which was allegedly *ultra vires*. Accordingly, *Whitfield* is inapposite.

A contract which is *ultra vires* is, in itself, void and unenforceable against the State. It thus follows that where there is no valid contract to enforce against the State, the defense of sovereign immunity is inapplicable.

Whether the alleged contractual promises in this case were *ultra vires* and whether Plaintiffs are "ultimately entitled to relief are questions not properly before us[,]" *Archer v. Rockingham Cty.*, 144 N.C. App. 550, 558, 548 S.E.2d 788, 793 (2001), *disc. review denied*, 355 N.C. 210, 559 S.E.2d 796 (2002), as "[w]e are not now concerned with the merits of the controversy[.]" *Smith*, 289 N.C. at 322, 222 S.E.2d at 424. By this opinion, we conclude only that sovereign immunity cannot and does not bar the enforcement of an *ultra vires* contract against the State because an *ultra vires* contract is, in itself, unenforceable.

### 3. *Corum* Claim

[4] Next, the State argues that sovereign immunity bars Plaintiffs' "takings" claim brought under North Carolina Constitution Article I, Section 19.

In *Corum v. Univ. of N.C.*, 330 N.C. 761, 413 S.E.2d 276, *reh'g denied*, 331 N.C. 558, 418 S.E.2d 664, *cert. denied sub nom. Durham v. Corum*, 506 U.S. 985, 121 L. Ed. 2d 431 (1992), our Supreme Court held that "[t]he doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights." *Id.* at 785-86, 413 S.E.2d at 291. The Court explained that "when there is a clash between these constitutional rights and sovereign immunity, the constitutional rights must prevail." *Id.* at 786, 413 S.E.2d at 292. Following *Corum*, this Court held in *Sanders v. State Pers. Comm'n*, 183 N.C. App. 15, 644 S.E.2d 10, *disc. review denied*, 361 N.C. 696, 652 S.E.2d 653 (2007), that "sovereign immunity is not available as a defense to a claim brought directly under the state constitution." *Id.* at 18, 644 S.E.2d at 12.

Here, Plaintiffs allege that they

had a contractual right to level premiums for their Long-Term Care Benefits provided under the State Health Plan through the

MedAmerica Group Policy and subsequent group policies for Long-Term Care Benefits provided under the State Health Plan following the termination of the MedAmerica contract with the State Health Plan, and this contractual right was and is a property right that could not be taken without just compensation under N.C. Constitution Article I, Section 19.

The State argues that since sovereign immunity bars Plaintiffs' underlying contract claim, "the contract cannot give rise to an enforceable 'property right' and sovereign immunity bars Plaintiffs' 'takings' claim." However, as discussed above, we have concluded that sovereign immunity does not bar Plaintiffs' breach of contract claim. Furthermore, as Plaintiffs brought their takings claim pursuant to Article I, Section 19 of the North Carolina Constitution, the State is not entitled to the defense of sovereign immunity against this claim. *See also Peverall v. Cty. of Alamance*, 154 N.C. App. 426, 430, 573 S.E.2d 517, 519 (2002) ("It is well established that sovereign immunity does not protect the state or its counties against claims brought against them directly under the North Carolina Constitution."), *disc. review denied*, 356 N.C. 676, 577 S.E.2d 632 (2003).

**[5]** The State next argues that the trial court erred in denying its motion to dismiss Plaintiffs' *Corum* claim under N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) because adequate alternative remedies exist. We agree.

"In reviewing a trial court's Rule 12(b)(6) dismissal, the appellate court must inquire whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Newberne v. Dep't of Crime Control & Pub. Safety*, 359 N.C. 782, 784, 618 S.E.2d 201, 203 (2005) (quotation marks and citations omitted).

A claim under our state constitution is available only "in the absence of an adequate state remedy." *Corum*, 330 N.C. at 782, 413 S.E.2d at 289. "[T]he term 'adequate' in *Corum* is not used to mean 'potentially successful[,]' " *Craig v. New Hanover Cty. Bd. of Educ.*, 185 N.C. App. 651, 656, 648 S.E.2d 923, 927 (2007), but rather "the Court is using 'adequate remedy' to mean [an] 'available, existing, applicable remedy.' " *Id.* On the other hand, a plaintiff must be allowed to pursue claims for the same alleged wrong under both the constitution and state law where one could produce only equitable

relief and the other could produce only monetary damages, thus "complet[ing] [the plaintiff's] remedies[.]" *Corum*, 330 N.C. at 789, 413 S.E.2d at 294.

In *Craig*, the plaintiff claimed that the State had denied him his constitutional right to and liberty interest in an education that was free from harm, and that the State was "negligent in failing to provide adequate protection for him from a fellow student, a claim that, under state law, is a common law negligence claim." *Craig*, 185 N.C. App. at 655, 648 S.E.2d at 926. Because the negligence "claim would vindicate the same rights as the constitutional argument put forth by [the] plaintiff—namely, his right to attend school without being harmed by classmates[,]" *id.*, this Court determined that the plaintiff had an adequate remedy under state law and, thus, could not bring his constitutional claim.

Here, Plaintiffs' complaint alleges that they

had a contractual right to level premiums for their Long-Term Care Benefits provided under the State Health Plan through the MedAmerica Group Policy and subsequent group policies for Long-Term Care Benefits provided under the State Health Plan following the termination of the MedAmerica contract with the State Health Plan, and this contractual right was and is a property right that could not be taken without just compensation under N.C. Constitution Article I, Section 19.

As a result of this alleged "taking," Plaintiffs allege they "have suffered damages in excess of $10,000" and seek "damages as against Defendants State Health Plan and the State of North Carolina . . . in an amount in excess of $10,000 . . . ." By their breach of contract claims against the State, Plaintiffs also allege that they "have suffered damages in an amount in excess of $10,000" and seek "damages as against Defendants State Health Plan and the State of North Carolina . . . in an amount in excess of $10,000 . . . ." Because Plaintiffs' breach of contract claim would not "complete[] [Plaintiff's] remedies," *Corum*, 330 N.C. at 789, 413 S.E.2d at 294, but would instead "vindicate the same rights as the[ir] constitutional argument[,]" *Craig*, 185 N.C. App. at 358, 648 S.E.2d at 926, namely, monetary damages in excess of $10,000, Plaintiffs have an adequate alternative remedy under state law and, thus, their "takings" claim under N.C. Constitution Article I, Section 19 should have been dismissed.[3]

3. It is also of note that this Court in *Archer*, citing *Smith, supra*, explained that one rationale for a state implicitly consenting to being sued upon any valid contract

Accordingly, we reverse the trial court's denial of the State's Rule 12(b)(6) motion.

## 2. MedAmerica's Crossclaims

### A. *Ultra Vires* Contract

**[6]** The State next argues that "[s]overeign immunity bars MedAmerica's breach of contract claim because the alleged contractual promises are *ultra vires* to the State Health Plan."

As discussed above, a contract which is *ultra vires* is, in itself, void and unenforceable. Where there is no valid contract to enforce, the defense of sovereign immunity is inapplicable. Whether the alleged promises were, in fact, *ultra vires* is a matter for the trial court as "[w]e are not now concerned with the merits of the controversy[.]" *Smith*, 289 N.C. at 322, 222 S.E.2d at 424. We reiterate that sovereign immunity cannot and does not bar the enforcement of an *ultra vires* contract against the State because such a contract is unenforceable in any event, and we overrule the State's argument.

### 2. Indemnity

**[7]** Finally, the State asserts that sovereign immunity bars MedAmerica's implied-in-law indemnity crossclaim. We agree.

"[A] right to indemnity exists whenever one party is exposed to liability by the action of another who, in law or equity, should make good the loss of the other." *McDonald v. Scarboro*, 91 N.C. App. 13, 22, 370 S.E.2d 680, 686 (quotation marks and citation omitted), *disc. review denied*, 323 N.C. 476, 373 S.E.2d 864 (1988). "In North Carolina, a party's rights to indemnity can rest on three bases: (1) an express contract; (2) a contract implied-in-fact; or (3) . . . a contract implied-in-law." *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 38, 587 S.E.2d 470, 474 (2003).

A party's right to indemnity based on an express contract arises out of an indemnity clause specifically set out in a contract as part of the bargained-for exchange. *Kaleel Builders*, 161 N.C. App. 34, 587 S.E.2d 470. Here, MedAmerica does not assert that there was an

---

into which it enters, thus waiving sovereign immunity, is that to deny a party who has performed his obligation under a contract the right to sue the state when it defaults is to take his property without compensation and thus to deny him due process. *Archer*, 144 N.C. App. 550, 548 S.E.2d 788 (2001). Accordingly, this Court in *Archer* and *Smith* implicitly recognized that a suit against the State for breach of contract could essentially be a "takings" claim.

indemnity clause in their contract with the State, instead seeking indemnity based on implication.

> A right of indemnity implied-in-fact stems from the existence of a binding contract between two parties that necessarily implies the right. The implication is derived from the relationship between the parties, circumstances of the parties' conduct, and that the creation of the indemnitor/indemnitee relationship is derivative of the contracting parties' intended agreement.

*Id.* at 38, 587 S.E.2d at 474. In order to establish such a right to indemnity, this Court has required a plaintiff to show special circumstances from which such an agreement might be implied. *See, e.g., McDonald,* 91 N.C. App. 13, 370 S.E.2d 680 (holding that a defendant had submitted sufficient evidence to establish the existence of an implied-in-fact contract for indemnity with respect to attorney's fees where another defendant had orally agreed to provide him with an attorney in the event he was sued by plaintiff for breach of contract).

> Indemnity implied-in-law

> is a *quasi* contract, which may result either from a tortious wrong . . . or from one that is contractual. A quasi-contractual obligation is one that is created by the law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent[.]

*Cox v. Shaw,* 263 N.C. 361, 367, 139 S.E.2d 676, 681 (1965) (quotation marks and citations omitted). Although implied-in-law indemnity is most frequently utilized in the tort context as a means of resolving liability among defendants, a particular quasi-contract can also be of a contractual origin. *Cox,* 263 N.C. 361, 139 S.E.2d 676. "[T]he primary distinction between [implied-in-fact and implied-in-law indemnity] is that [implied-in-fact] indemnity involves a true contract based on implied consent while [implied-in-law] indemnity is a legal fiction used to avoid unfairness." *Northeast Solite Corp. v. Unicon Concrete, LLC,* 102 F. Supp. 2d 637, 641 (M.D.N.C. 1999). Here, MedAmerica has neither alleged nor shown the existence of a relationship with the State nor special circumstances from which a contractual right of indemnity may be implied-in-fact. Accordingly, MedAmerica's claim for indemnity may only be based upon a contract of indemnity implied-in-law.

In North Carolina, the State waives sovereign immunity only when it expressly enters into a valid contract. *Smith,* 289 N.C. 303, 222 S.E.2d 412. In *Whitfield,* our Supreme Court stated:

we will not first imply a contract in law where none exists in fact, then use that implication to support the further implication that the State has intentionally waived its sovereign immunity and consented to be sued for damages for breach of the contract it never entered in fact. Only when the State has implicitly waived sovereign immunity by *expressly* entering into a *valid* contract through an agent of the State expressly authorized by law to enter into such contract may a plaintiff proceed with a claim against the State upon the State's breach.

*Whitfield*, 348 N.C. at 42-43, 497 S.E.2d at 415 (emphasis original). Accordingly, the law is clear that the State's sovereign immunity bars MedAmerica's claim for indemnification based on a contract for indemnity implied-in-law.[4] Accordingly, we reverse the trial court's denial of the State's motion to dismiss as to this issue.

For the above-stated reasons, the trial court's order is

AFFIRMED IN PART, REVERSED IN PART.

Chief Judge MARTIN and Judge TYSON concur.

---

4. MedAmerica entered into an express contractual relationship with the State to provide insurance. MedAmerica could have freely negotiated the inclusion of an express indemnity clause, whereby the State's sovereign immunity would have been waived.